CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 05 2015

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 7:07CR00006 |
| | ) | (CASE NO. 7:12CV80544) |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| | ) | |
| NYRON NICHOLS, | ) | By: Hon. Glen E. Conrad |
| | ) | Chief United States District Judge |
| Defendant. | ) | |

Nyron Joel Nichols, a federal inmate proceeding pro se, filed this motion to vacate, set aside or correct the sentence, pursuant to 28 U.S.C. § 2255. Nichols is challenging the validity of his confinement pursuant to the judgment of this court entered July 11, 2008, whereby he was convicted of drug trafficking conspiracy and related offenses and sentenced to life in prison. Upon review of the extensive record, the court concludes that the government's motion to dismiss must be granted. Because the court finds that Nichols has not stated any claim for relief under § 2255 and could not do so with the discovery he requests, the court will also deny his pending motions for appointment of counsel,[1] discovery, and an evidentiary hearing.

## Background

Authorities arrested Nichols on January 3, 2007, on a complaint charging him and others with drug and firearms offenses. A grand jury of this court returned an indictment on January 25, 2007, charging Nichols with conspiracy to possess with intent to distribute more than 50 grams of cocaine base, and a measurable quantity of cocaine powder, in violation of 21 U.S.C. §§ 841 (a) (1), 846 (2006) (Count One); distributing a measurable quantity of cocaine powder (Counts Two, Four, and Five); distributing more than 50 grams of crack cocaine (Count Six and Eight); and possessing

---

[1] Upon finding from the record that Nichols is not entitled to relief under § 2255, the court cannot find that "the interests of justice . . . require" appointment of counsel. See Criminal Justice Act, 18 U.S.C. § 3006A(a)(2)(B). For the same reason, the court cannot find that discovery is warranted. See Rule 6, Rules Governing § 2255 Proceedings (requiring leave of court for discovery, to be granted for good cause shown).

a firearm in furtherance of a drug trafficking offense and/or using or carrying a firearm during and in relation to a drug trafficking crime on December 10, 2006, and December 22, 2006, in violation of 18 U.S.C. § 924 (c) (1) (A) (2006) (Counts Three and Seven, respectively).

Nichols retained Bruce Welch, Esq., to represent him. During the course of the representation, however, Welch became gravely ill and ultimately died. Nichols next retained David Walker, Esq., who became counsel of record on August 9, 2007. The government provided extensive discovery materials to the defense before trial. In addition, Walker filed numerous motions, seeking additional materials, including copies of plea agreements, criminal history reports, and other records related to the government's coconspirator witnesses, with the names redacted; the prosecution was directed to provide unredacted copies of these materials to the defense within a day or two of trial. The case against Nichols and his co-defendant, Eduardo Riles, was tried on December 17, 18, and 19, 2007.

### The Trial

The heart of the case against Nichols was evidence about agents' use of a confidential informant, John Rowland, to arrange and carry out five controlled drug purchases in late December 2006, from Nichols. The government presented testimony from agents who worked with Rowland to set up transaction times and meeting places with Nichols by telephone, searched Rowland and his car for drugs before and after each interaction with Nichols, conducted surveillance as Rowland carried out the transactions, and met with him afterwards to collect the merchandise and debrief him. A toxicologist witness authenticated drug test reports showing that the substance Rowland purchased from Nichols in each controlled buy was cocaine powder (in three of the buys) or cocaine base, also known as crack (in the other two buys).

Jurors also heard audio recordings and viewed written transcripts of telephone conversations arranging meeting places for Rowland to obtain drugs from Nichols and to deliver cash payments to

2

him for the drugs. Rowland wore a wire when he met with Nichols, and jurors heard recordings of some of the transactions. Rowland also testified about each of the tapes and transactions.

Rowland testified that he met Nichols at his residence several times and once received the drugs there. In the recordings, the parties mention the terms "green card" and "paper," which referred to the money, according to Rowland, that the agents gave him to pay Nichols for the cocaine purchases. (Mot. Dism. Attach. Joint Appendix ("JA") 550, 558, 565-66, 572, ECF No. 288.) The prosecutor asked if these terms were actually referring to marijuana, but Rowland denied this usage, said he had never heard the term "green card" to refer to marijuana, and indicated that he could not have had marijuana during the controlled buys because agents would have found it when they searched him and his car.[2]

Rowland also testified that even before the controlled purchases, he knew of Nichols, also known as "Red," by his reputation as a dangerous drug kingpin. Rowland said Nichols displayed a gun on some occasions when Rowland met with him to pick up drugs or deliver payment for drugs. During one taped conversation, Nichols said he owned forty-one firearms. At the time of the December 27, 2006, transaction, Nichols had a dog with him that scared Rowland. Nichols called the dog Lady.

On cross examination, Walker questioned Rowland about the necessity of lying as a confidential informant and Rowland's history of lying in that manner. Rowland testified that he

---

[2] After Rowland testified on direct about how thoroughly officers searched his person before each controlled buy, the prosecutor asked him:

Q.   Were you bringing in marijuana?
A.   No.
Q.   Why was that funny? Why would—why would it be strange to bring marijuana to that meeting [with police before the controlled buy]?
. . . .
A.   [The police] searched my car real good. Tore up my back, took my speakers out and everything.

(JA 544.) When the prosecutor asked Rowland if "green card" as heard on the recording referred to marijuana, Rowland said that the term referred to money and he had never heard it used to refer to marijuana.

3

was assisting authorities in hopes of achieving leniency for his incarcerated brother. Walker's questioning then suggested that Rowland had run out of drug dealers to help police with on his brother's behalf, so made up a case against Nichols. He asked Rowland when he had taped the transaction in which Nichols referred to his pit bull as Lady, suggesting that it must have been before Lady was euthanized in late November 2006.

Agents testified about Nichols' arrest and items seized from his home. Based on the controlled drug transactions with Nichols, agents obtained an arrest warrant for Nichols and a search warrant for his residence. On January 3, 2007, officers observed Nichols' vehicle leaving his residence, stopped and arrested him, and took him into custody. Investigators then executed the search warrant. Two black males and a large pit bull present were secured during the search operation. Investigators found and seized from the three-bedroom residence a Bushmaster assault rifle and a Glock 40 caliber pistol, both with loaded magazines; $13,000 hidden in a bedroom closet; $4,412 hidden in a plastic water bottle in another bedroom closet; two digital scales, and one manual scale. Mixed in with the seized cash were bills that had recently been paid to Nichols by the confidential informant during the controlled buys. Agents also seized a 1993 Cadillac and a 2003 GMC Yukon, both suspected to be, and later forfeited as, fruits of Nichols' drug operation.

Agent Jonathan Blais testified about an interview he had with Nichols after his arrest. Nichols waived his <u>Miranda</u> rights.[3] According to Blais, Nichols said that a Jamaican man named "John" had brought him to Roanoke in 1997 or 1998 to work as protection for John and later for Earl Hill, using "lots of firearms" to rob people for drugs and money. (JA 150.) Blais said Nichols described himself as a ruthless individual, who had taken and sold drugs in New York, North Carolina, South Carolina, and Pennsylvania, as recently as September 2006. Blais said Nichols

---

[3] <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966) (requiring law enforcement to inform individuals who are in custody of their Fifth Amendment rights prior to interrogation).

claimed to own three firearms, including a Bushmaster and a Glock. According to Blais' testimony, Nichols stated that he knew an individual in New York who then possessed thirteen kilograms of cocaine and that Nichols had possessed four or five kilograms of cocaine at a time and could obtain five or six kilograms of cocaine for forty or fifty thousand dollars. Blais said he took notes during his interview with Nichols, but did not tape record it.

Several individuals facing prison time for drug crimes testified that they had bought cocaine or crack cocaine from Nichols. Michael Loveless testified that he started dealing with Nichols in 1999. He said a man named "Buff" (later identified as Danny Lee Clement) introduced Nichols to Loveless and his brother, Wayne Loveless. (JA 226.) Loveless said after two small transactions, Nichols fronted him between 4.5 and 9.0 ounces every two weeks, from 1999 to 2004. Loveless also estimated that he cooked three kilograms of cocaine powder into cocaine base for Nichols and that his brother Wayne purchased one kilogram of cocaine powder weekly from Nichols between 2001 and 2003.

Clement testified that he was selling crack cocaine at the Cherry Hill Apartments in Roanoke in 1990, 1991, or 1992, when he first met Nichols, who had come to the area from New York. Clement said he and Nichols eventually went into business together. He testified that Nichols would get drugs from different suppliers in New York and deliver amounts to Cherry Hill two or three times a day. Clement said he and Nichols were selling four and a half to nine ounces every two days, and by 1995 or 1996, were getting up to a half a kilo per week. Clement testified that he and Nichols made good money, which they spent on nice cars, women, marijuana, clothes and jewelry, and trips. He testified that in 1998, he and Nichols built and later improved a "cocaine press," which they used to convince buyers to pay more money for their product. (JA 297.) Clement described vehicles with hidden stash boxes that Nichols used to transport drugs from New York: a Millenium that held up to two kilos, a Ford Explorer that would hold up to thirty kilos, and

5

a black Honda. Clement testified that Nichols would receive ten kilos of cocaine every week and front it to various distributors in the area, including Clement.

Because other drug dealers wanted to rob Nichols, Clement said, he often worked protection for Nichols. He testified that Nichols did not keep cocaine at his house, and they stockpiled firearms, up to forty or fifty at one time. To legitimize some of the money they were making, Clement said, he and Nichols started a car wash, and both worked in it; Nichols bought a house, refurbished it, and sold it; and Nichols bought and sold pit bull puppies. Clement also testified that he was careless with money, buying cars and marijuana without saving for the future. In 2004, Clement said that he began to fear being arrested in Roanoke, so he moved to North Carolina. Clement testified that a man named Brandon, nicknamed "Whiz," took over as Nichols' body guard. (JA 315.)

On cross examination, which was more extensive than direct examination, Walker grilled Clement on, among other issues, the true scope of his drug dealing with Nichols. Confronted with a birth certificate that showed Nichols was only 15 years old in 1992, Clement admitted that he and Nichols did not sell drugs together every day in 1992 and 1993, as his previous testimony had implied. Walker also elicited Clement's admission that he himself had lived and served jail time in North Carolina during that time, although Clement still claimed Nichols had been his drug "supplier." (JA 336.) In discussing Clement's claim that Nichols never kept drugs at his residence, Walker asked Clement, "So if a guy named John Rowland . . . says he went to [Mr. Nichols'] house on numerous occasions and bought drugs from Mr. Nichols, he's lying?" Clement answered, "Yes, he is." (JA 386.)

Antwannique Banks testified that from early in 2003 through 2004, Nichols was fronting him 4.5 ounces of cocaine powder once or twice a week. Banks said he stopped the relationship after Nichols pulled a gun on him over a $4,000 drug debt. Banks testified that he tried to buy an

6

Explorer from Nichols, but the price Nichols quoted was too high, because the vehicle had a stash box big enough to hold a small person.

Jimmy Still testified that while he and Nichols shared a jail cell, Nichols told him about his ten years of drug trafficking. Still said Nichols claimed to have sold ten to twenty kilos of cocaine a week, transporting it to Roanoke from New York using stash boxes built into his vehicles. Still also said Nichols talked about a stash of guns, including a possible murder weapon.

Paul Muse testified that although he had known before his arrest who Nichols was, the two men first talked while in the same pod at the jail. Muse said that Nichols never talked about his drug business or guns and told Muse that he would "send the goons out on" anyone who testified against him. (JA 414.)

The defense case was brief. A city animal control officer testified that on November 27, 2006, he impounded a female pit bull that Nichols called Lady after a citizen made a dangerous dog complaint about her. An animal shelter director testified that this dog was euthanized in December 2006. The parties stipulated that in January 2006, Nichols sold a house he had renovated and after paying off all loans associated with it, collected $32,533.22 in proceeds from the sale. They also stipulated that Nichols deposited the proceeds to his account at Sun Trust Bank and later the same day, withdrew $27,000 of that amount in three, separate checks for $9,000 each. Nichols' landlord testified that Nichols paid his rent every three months. On cross examination, the landlord said Nichols paid in cash and kept dogs at the apartment against the terms of the original rental agreement. Paula Thomas, a licensed veterinary technician, testified as an experienced breeder of pit bull terriers about the average prices breeders could ask for puppies in Virginia.

On December 19, 2007, a jury found Nichols guilty of conspiracy, three counts of distributing cocaine powder, two counts of distributing crack cocaine, and one firearm offense

7

under § 924(c) on December 22, 2006 (Count Seven).[4]  Walker filed several post-trial motions—seeking judgment of acquittal, to have the verdict set aside, to have a new trial, and to obtain discovery of other defendants' presentence reports.  The court conducted hearings on these motions and ultimately upheld the conviction.

### Sentencing

The court conducted Nichols' first sentencing hearing on April 28, 2008.  In preparing the presentence investigation report ("PSR"), the probation officer relied on drug amounts from Clement's testimony to calculate Nichols' base offense level for the drug offenses.  Walker stated his intention to put on evidence to discredit Clement's testimony that Nichols was his drug supplier from 1991 to 2005, based on Clement's own conflicting statements, Clement's unspecified periods of incarceration in the 1990s, and school records showing that Nichols was only 12 or 13 years old and attending school in New York in the early 1990s.  Ultimately, the court ruled that Clement's testimony would not be considered in determining the drug weight for which Nichols should be sentenced.  Accordingly, the court asked the probation officer to revise the presentence report and postponed sentencing.

The revised PSR relied on testimony from Banks, Michael and Wayne Loveless, and Jeteime Arrington in calculating the drug weight for which Nichols should be held accountable.  At the second sentencing hearing, on July 8, 2008, Walker argued that these witnesses' testimony on drug weights was vague and unreliable, based on specific inconsistencies in the testimony itself and in prior statements.  He called Agent Ayers, who had used Loveless as a confidential informant in 2006.  Ayers said that Loveless was not able to arrange controlled buys with Nichols and that agents had to stop using Loveless as an informant after catching him with drugs.  Walker also entered into

---

[4]  Jurors found Nichols not guilty on Count Three, which also charged a § 924(c) violation.

evidence the indictments of Banks and Arrington, as well as earlier statements these witnesses gave authorities, which did not mention Nichols among their coconspirators.

Walker also objected to the PSR enhancement for obstruction, based on Muse's testimony that Nichols had threatened to send goons after any cooperating witnesses. Walker put on testimony from Nathaniel Martin, with a corroborating written statement from inmate Billow, that Nichols did not befriend Muse, and that Martin and other inmates had heard Muse say he would be lying if he testified about Nichols.

Walker called Agent Blais as a sentencing witness and asked if Blais had threatened, after Nichols' trial, to bring a firearms charge against Clement's half brother, Melvin Sales, if he testified at Nichols' sentencing. Blais said that he and other agents had talked with Sales, but denied threatening Sales with prosecution. The prosecutor then asked Blais about two statements he had taken from Sales in April and June 2008, in which Sales said Nichols and Clement had worked together selling drugs in Roanoke, starting when Nichols was thirteen and could not rent his own hotel room. Blais testified that Sales told him Nichols had asked him to testify that Clement's trial testimony was false, but that Sales believed Clement's trial testimony had been truthful and that Sales knew Clement had gotten Nichols hotel rooms when Nichols was a juvenile. Blais also said Sales told him that he was afraid of Nichols and felt his family would be threatened if he testified against Nichols.

Walker then called Sales to the stand and asked him to identify two statements, dated in March and April 2008, that Nichols had written for Sales to sign. These statements said that Clement was lying about Nichols' drug dealing and that agents had asked Sales if Nichols had paid him to testify for the defense, which Sales denied. Asked if these statements were truthful, Sales said, "He [Nichols] wrote these statements. I didn't write these statements. This is his truth." (JA 1184.) Sales then testified that Clement had money, drove fancy cars like a Corvette, an Audi, and

9

a Cadillac, and went back and forth between North Carolina and Roanoke to deal drugs. On cross examination, Sales said that he had signed without reading the statements Nichols wrote for him. Sales said he was afraid of Nichols and had heard that Nichols intended to pay someone $25,000 to kill Sales because of Clement's testimony.

On redirect, Walker pointed out that Sales had never asked officials at the jail to protect him because Nichols made him fear for his life. Sales denied that anyone from the government had promised him anything in exchange for giving statements or testifying.

For the government at sentencing, Blais testified that he had been investigating Nichols' drug dealing since 2003, a process that continued until Nichols' arrest in January 2007. Blais said the investigation indicated that Nichols had drug-related dealings with Byron Brandon (known as Wiz), Riles, Clement (known as Buff), and a now-deceased individual known as Jamaican Floyd. Blais testified that he had seen Clement and Nichols together during several surveillance operations and that investigation indicated that Clement was Nichols' protection. Blais also testified about Riles' post-arrest statement in February 2007 that Nichols had most recently acquired two and a half kilograms of cocaine, after Nichols' contact in New York robbed another drug dealer. Blais also verified the statements he himself had taken from Nichols after his arrest and from jail a inmate, Jimmy Still, about Nichols' descriptions of his ten-year drug business in Roanoke.

On cross examination, Blais admitted that he had never seen Nichols sell drugs. Walker also questioned Blais about inconsistent earlier statements from Arrington and Loveless in which they did not mention dealing with Clement, whom they identified at trial as Nichols' security officer.

After conclusion of the sentencing evidence, Walker argued that the drug weight calculation and the sentence enhancements for obstruction and supervisory role, as stated in the PSR, required unwarranted reliance on inconsistent and unreliable testimony. Walker also argued that the defense

had been hampered by not receiving clear information that Clement would testify against Nichols at trial, an argument the court did not find convincing.

In evaluating the evidence on the PSR objections, the court stated to Nichols:

> I can't remember another case that I've had where so concentrated an attack has been made on the government's evidence without really offering any evidence in rebuttal. I mean, Mr. Walker, I think has done a remarkable job in finding every little nuance, every little inconsistency, every little problem with the government's case, and I know that you've helped him with that, but really it's been a remarkable and astounding effort. It's just been very unusual and as I say, in my experience, unprecedented. I think that the effort that's been made on your behalf in attacking the presentence report and in attacking these findings has been of the highest quality.

(JA 1240.) Nevertheless, the court found itself "constrained to conclude that the findings of the probation officer in the presentence report are essentially accurate and complete." (JA 1240-41.) The court found that "the amount of drugs for which [Nichols] should be held responsible, was essentially consistent with the investigation made by law enforcement." (JA 1241.) The court found that the testimony of Loveless, Arrington, and Banks, whom the jury had found credible, was consistent with Nichols' own post-arrest statement to Blais, and so adopted the drug weight as stated in the PSR. The court also adopted the PSR finding that Nichols should receive an enhancement for obstruction of justice, based on the evidence that he threatened witnesses and solicited false testimony to help himself. Finally, the court also applied a three-level leadership role enhancement, finding from the evidence that Nichols had supervised at least one other person in a scheme involving five or more.[5] Having thus overruled all objections to the PSR, the court sentenced Nichols to life on the offenses involving cocaine base, with concurrent 240-month sentences on the offenses involving cocaine powder, and a mandatory consecutive sixty-month sentence on the § 924(c) offense.

---

[5] As stated in the PSR, the court found that based on a drug amount of 9.06 kilograms of crack cocaine, Nichols had a base offense level of 38, increased by two levels for obstruction of justice and three levels for supervisory role, for a total offense level of 43. Given his criminal history category I, his recommended sentence range under the advisory guidelines was life in prison on the drug offenses.

Nichols appealed, raising challenges to the validity of the indictment, the forfeiture order, the sufficiency of the evidence, the admissibility of certain evidence, the prosecutor's conduct, the denial of the motion to set aside the verdict based on sequestration violations and suppression of favorable evidence, the number of jurors present during trial, and the reasonableness of the sentence.[6] The United States Court of Appeals for the Fourth Circuit affirmed the judgment on May 20, 2011. United States v. Nichols, 429 F. App'x 355 (4th Cir. 2011), cert. denied, 132 S. Ct. 1093 (Jan. 17, 2012).

In his § 2255 motion, Nichols alleges ineffective assistance (1) by trial counsel and appellate counsel for failure to challenge each of the § 924(c) counts in the indictment as duplicitous; (2) by trial counsel for moving to continue the trial date; and (3) by trial counsel for failing to investigate, call certain witnesses, and build or perfect a defense. Nichols also alleges that (4) the prosecutor wrongfully withheld favorable evidence and failed to correct false testimony its witnesses gave, and may have attempted to influence Mr. Sales to testify falsely against Nichols. Nichols seeks appointment of counsel, discovery, and an evidentiary hearing.

## Discussion

Criminal defendants have a Sixth Amendment right to "reasonably effective" legal assistance. Strickland v. Washington, 466 U.S. 668, 687 (1984). To prove that counsel's representation was so defective as to require reversal of the conviction or sentence, a defendant must show (1) that "counsel's representation fell below an objective standard of reasonableness," considering circumstances as they existed at the time of the representation and (2) that "the deficient performance prejudiced the defense." Id. The first element "requires showing that counsel made

---

[6] Nichols also filed pro se motions claiming that the record of the trial proceedings included transcripting errors and sought to obtain copies of the court reporter's sound recordings of the proceedings. The court denied these motions, and Nichols' appeal was unsuccessful. United States v. Nichols, No. 7:07CR00006, 2009 WL 9072713 (W.D. Va. July 14, 2009), aff'd, 358 F. App'x 410 (4th Cir. Dec 23, 2009), cert. denied by Nichols v. United States, 559 U.S. 1116 (2010).

12

errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id.

A criminal defense attorney owes his client several basic duties: "loyalty . . . to avoid conflicts of interest," "to advocate the defendant's cause," "to consult with the defendant on important decisions," "to keep the defendant informed" of developments in the case, and to apply his legal knowledge and experience to provide reasonably effective professional representation. Id. at 688. "There are countless ways to provide effective assistance in any given case." Id. at 689. The habeas court must strive "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time" of the alleged error. Id. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. The defendant claiming a constitutional deficiency "must identify the acts or omissions of counsel" allegedly made without the exercise of "reasonable professional judgment," and show that in the context the attorney faced, these "acts or omissions were outside the wide range of professionally competent assistance." Id.

If it is clear that defendant has not established deficient performance, the court need not inquire whether defendant has satisfied the second prong of the Strickland test—prejudice. Id. at 697. Specifically, "the defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

"[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by [an attorney's] errors than one with overwhelming record support." Id. at 696. As both this court, and the Fourth Circuit, have recognized, the evidence against Nichols was overwhelming, as to guilt and punishment. (Sent. Tr., JA 1258, July 9, 2008) ("The fact of the matter is that the

13

evidence in your case was overwhelming. It was when your case was tried and it is again today [at sentencing].”); Nichols, 429 F. App’x at 357 (“Our review of the record leads us to conclude that the evidence overwhelmingly established that Nichols was guilty beyond a reasonable doubt of the drug offenses. . . . [W]e conclude that the evidence likewise overwhelmingly established that Nichols was guilty beyond a reasonable doubt of the § 924(c) offense); Id. at 358 (rejecting Nichols’ claim that the court considered unreliable evidence in determining the drug weight attributable to him and finding no error).

### Claim 1: Duplicitous § 924(c) Counts

In his first claim, Nichols asserts that trial and appellate counsel should have argued that the § 924(c) charges in the indictment (Counts 3 and 7) were duplicitous and therefore invalid. Specifically, Nichols faults each of these counts for improperly charging two separate offenses: (a) using and carrying a firearm during and in relation to, and (b) possessing a firearm in furtherance of, a drug trafficking crime.[7] He also asserts that counsel should have asked for special jury instructions or a special verdict form to correct this duplicity problem and that both these errors deprived him of a unanimous jury verdict on this count. This claim fails under both prongs of the Strickland analysis.

Nichols now concedes that trial counsel had no controlling authority on which to bring these claims at the time of Nichols’ trial in 2007.[8] The Fourth Circuit had “not yet decided whether §

---

[7] Section 924(c) states, in pertinent part:

[A]ny person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime

    (i) be sentenced to a term of imprisonment of not less than 5 years. . . .

18 U.S.C. § 924(c)(1)(A)(i).

[8] In his later submissions, Nichols concedes that trial counsel was not ineffective for failing to raise a duplicity challenge.

14

924(c) creates more than one offense." United States v. Woods, 271 F. App'x 338, 343 (4th Cir. Mar. 26, 2008) (unpublished).[9] Counsel's failure to anticipate during Nichols' trial in December 2007 the particular outcome of the Woods decision more than three months later was not constitutionally deficient representation. United States v. McNamara, 74 F.3d 514, 416 (4th Cir. 1996; Clanton v. Bair, 826 F.2d 1354, 1359 (4th Cir. 1987) (finding that counsel is not ineffective for failing to raise an objection or make a motion for which there is "no obvious basis").

Likewise, as Nichols has now conceded, appellate counsel had no obvious basis for a viable claim challenging the form of the indictment on appeal. Because the duplicity claim was not raised at trial, that claim was waived for appeal purposes, unless the appellate court found that the district court had committed plain error, which counsel could not show at the time of Nichols' appeal. See United States v. King, 628 F.3d 693, 699, 700 n.3 (4th Cir. 2011) (finding duplicity claim waived and no plain error based on Woods, because issue still unsettled in the Fourth Circuit). Furthermore, appellate counsel is not obligated to raise every possible, nonfrivolous claim on appeal. United States v. Baker, 719 F.3d 313, 318 (4th Cir. 2013). In fact, an appellate attorney "enjoys a "presumption that he decided which issues were most likely to afford relief on appeal, a presumption that a defendant can rebut [in habeas review] only when ignored issues are clearly stronger than those presented." Id. at 318 (internal quotations and citations omitted). Nichols makes no such showing here.[10] For the stated reasons, the court will grant the motion to dismiss as to Claim 1.

---

[9] In Woods, in addressing defendant's challenge to a jury instruction, the panel adopted the conclusion previously reached by three other courts of appeals to have decided the issue and held "that § 924(c) indeed creates distinct 'use and carry' and 'possession' offenses." 271 F. App'x at 343 (citations omitted).

[10] See, e.g., King, 628 F.3d at 700 (recognizing circuit split in 2011 on whether indictment's mixing of § 924(c) elements constitutes reversible error).

Nichols also raises by amendment an independent duplicity challenge to the indictment and the jury instructions on the § 924(c) counts, complaining that he was deprived of a unanimous verdict on this offense. Nichols raised similar claims in his pro se supplemental appeal brief. If the Fourth Circuit had been concerned about the validity of Nichols' § 924(c) conviction on duplicity grounds, the Court could have accepted and addressed his supplemental brief making this point, but the Court refused to do so, denying his motion for his brief to be filed. It is well established that a § 2255 motion is not a vehicle for relitigating claims already presented on direct appeal. See United States v. Linder, 552 F.3d 391, 396 (4th Cir. 2009); Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir. 1976) (holding that issues previously decided on direct appeal may not be raised on collateral review). This court may not reconsider an issue already rejected by the appellate court.

In any event, Nichols cites no controlling authority under which he would now be entitled to a new trial, based on the wording of the § 924(c) offense in the indictment and jury instructions.[11] The evidence overwhelmingly established Nichols' guilt on this count. Nichols, 429 F. App'x at 357. Rowland testified that during the controlled buy on December 22, 2006, while Nichols produced and weighed the drugs in the kitchen of his residence, Rowland saw a firearm sitting on the table. Rowland also testified that Nichols' cousin, who was present during this transaction, was carrying a gun. These facts support a finding that Nichols possessed a firearm in furtherance, and used and constructively carried a firearm during and in relation to, a drug trafficking offense on December 22, 2006. See, e.g., United States v. Mingo, 237 F. App'x 860, 864-65 (4th Cir. 2007) (denying relief on duplicity claim where evidence supported guilt under all facets of § 924(c)).

---

[11] See, e.g., United States v. Sarvis, No. 13-4898, __ F. App'x __, 2015 WL 451913, *1-2 (4th Cir. Feb. 4, 2015) (rejecting duplicity claims regarding § 924(c) indictment and jury instructions, finding "no error"); United States v. Latham, 903 F.Supp.2d 354, 357 (E.D.N.C. 2012) (dismissing § 2255 duplicity claim for lack of controlling authority that § 924(c) criminalizes two separate offenses and citing legislative history implying that the statute does not create separate offenses).

16

Nichols raises yet one more amended claim, asserting that the Fourth Circuit Local Rule 36, in relation to the use of its unpublished decisions, should be ruled unconstitutional, on its face and as applied to his duplicity claims. Section (a) of Rule 36 states, in part: "Opinions delivered by the Court will be published only if the opinion satisfies one or more of the standards for publication," which are then listed. 4th Cir. Local Rule 36(a). Because the Court will not consider its own prior, unpublished decisions as binding on district courts in the circuit, Nichols asserts that the rule limiting when decisions may be published deprived him of a unanimous verdict concerning the firearm charge, citing the unpublished decision in Woods, 271 F. App'x at 343. The court finds no authority on which this district court could hold an appellate court rule to be unconstitutional, on its face or as applied by the Court.

### Claim 2: Motion for Continuance

In the summer of 2007, Nichols' first attorney, Bruce Welch, became too ill to continue the representation, and Nichols retained new counsel. On August 9, 2007, David Walker became counsel of record. At that time, the case was scheduled for a jury trial on September 20 and 21, 2007, against Nichols and his codefendant Eduardo Riles. On September 13, 2007, Walker filed a motion for continuance of the trial. Walker stated that when he first received Welch's file after some delay, it appeared that the case was "substantially ready for trial." (M. Cont. 1, ECF No. 45.) After meeting with Nichols and a third party, Walker said he had learned of records which he "believe[d] in good faith . . . [were] needed in order to adequately prepare a defense, and determine whether or not to call certain individuals as witnesses." (Id.)

In Claim 2 of this § 2255 motion, Nichols asserts that Walker's decision to move for continuance constituted ineffective assistance. Nichols asserts that the case was ready for trial, and he and Walker both feared that delay would allow the government to build a "jail house" case against him by obtaining evidence from codefendants and other inmates to bolster the conspiracy

17

evidence and increase the amount of drugs for which Nichols would be sentenced. Nichols asserts that without the continuance, he would only have been defending himself against the conspiracy charge based on the testimony of fewer drug trafficker witnesses and, if convicted, would have been sentenced only for the drug amounts involved in the controlled transactions. He asserts that after the continuance, the government interviewed Arrington, Loveless, Banks, and others, whose testimony, uncorroborated by physical evidence, was used to increase the amounts of drugs and money involved in the conspiracy, and to support a role enhancement and obstruction of justice enhancement. Nichols claims that Walker misled him into believing that the government had asked to continue the September trial date, so Nichols did not protest to the court at the time.

Walker disputes Nichols' account of the situation he faced in September 2007 and states his certainty that Nichols agreed to the continuance, although he has no documentation of this point. Walker had only been counsel of record for a month. He states, "[W]ith or without Mr. Nichols' permission, there was no way that I could have gone forward with trial on September 21, 2007." (Walker Affid. 3, ECF No. 288-1.) Evidence in the record bolsters this statement.

Nichols does not argue that Walker's decision to move for continuance deprived him of a speedy trial. At the heart of this claim (and the § 2255 motion as a whole) is Nichols' belief that if Walker had only done what Nichols told him to do and tried the case in September 2007, the government would have had much less evidence against him. This argument is pure speculation. If no continuance had been requested or granted in September, there is no way to predict the pace or the progression that the government's pretrial investigation, witness interviews, and evidence collection would have taken to prepare for the September trial date or how that evidence would have been presented differently in September than it was in December. Certainly, Nichols gives no evidence on which to find that Walker knew the government's evidence would be so much stronger in December that he should forego trial preparation he believed necessary in order to face the

18

weaker version of the case in September instead. Indeed, throughout his other claims, Nichols complains that the December trial was unfair because of Walker's alleged unfamiliarity with the evidence he had obtained through discovery and his lack of investigation of other information and witnesses. Thus, the court finds no reason to believe that Nichols would have been satisfied with Walker's performance, had he gone to trial in September.

Most importantly, a motion for continuance to prepare for trial is a classic example of a strategic decision by counsel that the court must presume reasonable. Strickland, 466 U.S. at 689-90. The attorney's duty to consult with his client does not require counsel to obtain consent for "every tactical decision." Taylor v. Illinois, 484 U.S. 400, 417 (1988) (finding an attorney has authority to manage most aspects of the defense without obtaining his client's approval); Stewart v. Nix, 972 F.2d 967, 970 (8th Cir. 1992) ("Generally, motions for a continuance pertain to trial tactics or conduct of the trial process and are largely left to trial counsel's discretion. Courts will rarely interfere with or second-guess such motions . . . ."). A defense attorney's tactical decision amounts to unreasonable performance under the Strickland analysis "only if it was so patently unreasonable that no competent attorney would have chosen it." Adams v. Wainwright, 709 F.2d 1443, 1445 (11th Cir. 1983).

Nichols has not presented evidence persuading the court that no competent counsel would have moved for continuance in the circumstances Walker faced in September 2007. Therefore, he has not shown ineffective assistance in this respect under Strickland, and the court will grant the motion to dismiss as to Claim 2.

### Claim 3: Investigation and Preparation

The record reflects that Nichols' relationship with Walker was often contentious. After his conviction, Nichols wrote conflicting letters to the court, sometimes alleging that Walker had conspired with the government to make the trial unfair and sometimes expressing satisfaction with

Walker's assistance. At a hearing on March 25, 2008, the court asked Nichols directly if he wanted new counsel for sentencing. Nichols affirmed that he had confidence in Walker's representation and unequivocally asserted that he wanted Walker to continue representing him.

Two months later, Walker moved to withdraw from the representation, stating his belief that Nichols had lost confidence in him. Nichols wrote to the court, objecting to Walker's motion, because "he's running from doing what I tell him to do." (Letter dated May 29, 2008, ECF No. 131.) The court conducted a hearing on June 11, 2008, where Walker explained that Nichols was accusing him of conspiring with the government and, on that basis, was refusing to share some information with him. On the other hand, Walker explained that Nichols had provided him with more than 400 pages of information and ideas Nichols believed were important to proving his innocence. Walker said Nichols' insistence that certain trial matters be investigated was hampering their ability to focus on issues relevant to the upcoming sentencing proceeding.

The court questioned Nichols about these allegations, and offered to grant Walker's motion and to appoint counsel for Nichols if he qualified financially for this service. Nichols stated that he "would rather keep Mr. Walker." (JA 1068.) The court asked Nichols: "Do you have confidence in Mr. Walker to look at the evidence you are talking about and help you make a decision as to how, if in any fashion, it should be presented?" (JA 1070.) Nicholas replied, "Yes, I do." (Id.) Nichols stated, "If there is one thing I can say about Mr. Walker, he has been communicating with me, and he answers my call. If I need a copy of something, he gives me a copy." (JA 1075.) The court then stated, "David Walker is one of the best defense attorneys around," and Nichols responded, "Yes, I do know he is." (JA 1076.) When the court asked Nichols to make a final decision about continuing Walker's representation for sentencing, Nichols agreed to do so. He stated that he did

not really believe that Walker was conspiring with the government.[12]  The court told Nichols, "You are going to have to rely on [Mr. Walker's] discretion to a substantial measure in determining what is relevant for sentencing and what is not. As has been said, it's not a time to retry the case. Can you live with that?" Nichols replied, "Yes, I can." (JA 1092.)

Walker describes the nature of his relationship with Nichols as follows:

> There was a tremendous amount of discovery material and Mr. Nichols insisted that some of the evidence was fabricated, and gave different explanations for some of the recordings that the government had which Mr. Nichols had made. Throughout the course of my representation of Mr. Nichols, new things would come to light, or Mr. Nichols would tell me of things that I needed to request from the government which he had not previously mentioned.
>
> In addition to the government's discovery and Jenck's Act materials, Mr. Nichols supplied me with handwritten notes which contradicted the government's evidence and caused me to make numerous trips to the jail to try to reconcile his information and the government's discovery. Mr. Nichols also gave me many witnesses whom he wanted me to subpoena. . . . [and] I had to try to contact many of the witnesses to determine whether they would testify in the way Mr. Nichols thought that they would. I made many requests for information in his case, and it often took lots of time to receive the requested information. In fact, a voluminous amount of information was received by me about one month before the trial actually occurred in December of 2007.
> . . . .
> [F]or each witness whom Mr. Nichols suggested that I call, we discussed what that person would testify to and how that would help his defense. He agreed on all the witnesses which were to be subpoenaed after I had either contacted the witnesses or my discussions with the witnesses convinced Mr. Nichols that some of the witnesses would be of no help in his trial.

(Walker Affid., ECF No. 288-1.)

Nichols admits that the evidence against him at trial was overwhelming. He also admits, and the record reflects, that Walker undertook substantial efforts to discuss the case and the evidence at length with Nichols and to investigate many potential witnesses and other evidence, at Nichols' request. Nichols denies that he agreed with Walker's decisions about witness selection. In

---

[12]  Because Nichols refused this offer of new counsel, the court finds that he has waived any claim under § 2255 that Walker conspired with the government or purposely sabotaged the defense in any way. In any event, Nichols has presented no evidence suggesting any such animus by Walker.

21

his multi-part third claim of ineffective assistance, based on years of further investigation and combing through the collected records, Nichols asserts that Walker's omission or rejection of numerous items of potential defense evidence and testimony were professionally unreasonable and caused Nichols to be wrongfully convicted and to receive a much harsher sentence than he deserved.

The sheer volume of Nichols' petition and exhibits demonstrates his belief that the court could find, from the cumulative effect of Walker's alleged omissions and mistakes, that the attorney's representation was constitutionally deficient. This belief is contrary to the constitutional standard the court must apply to an ineffective assistance claim, however. It is well established in the Fourth Circuit that the habeas court must "individually assess" each allegation of defense counsel error, rather than considering whether the cumulative impact of counsel's several alleged errors might add up to a constitutional violation. See Fisher v. Angelone, 163 F.3d 835, 852 (4th Cir. 1998) citing other cases). Nichols cannot cumulate Walker's many alleged errors to satisfy the deficient performance prong of the standard. Instead, he must demonstrate that at least one challenged action or omission "was so patently unreasonable that no competent attorney would have chosen it." Adams, 709 F.2d at 1445.

Nichols grounds the majority of his deficient performance claims on his frustration that Walker failed to investigate and present the case exactly as Nichols demanded of him. Again, he misunderstands the applicable constitutional standard.

> An attorney undoubtedly has a duty to consult with the client regarding "important decisions," including questions of overarching defense strategy. Strickland, 466 U.S., at 688. That obligation, however, does not require counsel to obtain the defendant's consent to "every tactical decision."

Florida v. Nixon, 543 U.S. 175, 187 (2004) (finding only certain decisions counsel must allow defendant to make, including "whether to plead guilty, waive a jury, testify in his or her own behalf,

or take an appeal") (citation omitted). While the defendant's own "informed strategic choices" and the information he provided to counsel are critical to determining the reasonableness of counsel's decisions regarding investigation and trial tactics, the defendant's opinion on these matters does not define the action counsel must take to meet his constitutional duty. Strickland, 466 U.S. at 691. Counsel must also "bring to bear such [professional] skill and knowledge as will render the trial a reliable adversarial testing process." Id. at 688. The record reflects that Walker more than met his duty to consult with Nichols about strategy and that he considered and investigated many of Nichols' ideas about witnesses and evidence. The mere fact that Walker did not try the case to Nichols' every specification does not constitute deficient performance under Strickland.

"[T]he decision whether to call a defense witness is a strategic decision, demanding the assessment and balancing of perceived benefits against perceived risks," and a habeas court must give great deference to such decisions. United States v. Terry, 366 F.3d 312, 317 (4th Cir. 2004) (rejecting claim that counsel was ineffective in failing to call three jail house witnesses who might have provided exculpatory evidence). Nichols must present facts sufficient to overcome "a strong presumption" that, based on information reasonably discoverable under the circumstances counsel faced at the time, "the challenged action might be considered sound trial strategy." Id. at 317. "[A] fundamental reality of trial practice is that often a weak witness or argument is not merely useless but, worse than that, may detract from the strength of the case by distracting from stronger arguments and focusing attention on weaknesses." Id. at 318.

In hindsight and without the pressures of limited time and resources counsel faced in preparing for a criminal trial, counsel's judgment calls about what investigation to pursue, which witness to call, or how to question a witness may seem less than perfect. Perfect representation is not what is constitutionally required, however. "It is essential to evaluate the entire course of the defense, because the question is not whether the lawyer's work was error-free, or the best possible

23

approach, or even an average one, but whether the defendant had the "counsel" of which the sixth amendment speaks." Williams v. Lemmon, 557 F.3d 534, 538 (7th Cir. 2009)  "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom."  Harrington v. Richter, 562 U.S. 86, 105 (2011) (internal quotation marks and citation omitted).

Thus, to prevail in his claims that counsel was ineffective for deciding not to investigate or call a certain witness, Nichols must show that this decision was so clearly flawed that no other competent counsel would have failed to call that witness.  Nichols has not made this showing as to any of Walker's alleged errors regarding witnesses.

Nichols' theory of the case, as he explained to the court in his allocution and to the Fourth Circuit in his appellate brief, was that the government had manufactured the case against him.  He admitted that some transactions with the CI had occurred, but insisted that they involved only marijuana.  From details on the audio tapes of the transactions, such as the mention of a dog named Lady and a dark-colored Honda, Nichols also wanted to argue that at least one transaction had occurred earlier than December 2006.  He wanted Walker to use these details and the "green card" references in the tapes to prove that the CI and the agents had fabricated one or more of those tapes and testified falsely to frame Nichols for cocaine and crack cocaine deals in December 2006 that never occurred.  This case theory also involved arguing that Agent Blais invented the details from his interview with Nichols, providing innocent explanations for the items seized at Nichols' residence, and proving government-instigated cell switches at the jail to allow certain inmates to fabricate incriminating statements from Nichols and to recruit other inmates to lie about having purchased cocaine or crack from Nichols.

Nichols now presents various pieces of evidence and testimony that he asked Walker to develop and present at trial in support of his government conspiracy theory that Walker refused to

24

use. To impeach inmate Still, who testified about Nichols' description of his large-scale drug operation, Nichols wanted two other inmates to testify that Still had asked them to join him in helping the government by testifying falsely against Nichols, whom they barely knew. To impeach inmate Muse, the government's witness on Nichols' obstruction of justice, Nichols wanted Walker to call inmates Martin, Billow, and Williams to testify that Muse had announced that anything he said about Nichols would be a lie. He complains that Walker flatly refused to call inmate witnesses. Nichols wanted inmate Brian Jackson, a garage technician, to testify that Nichols' Honda was at the garage for repairs and paint during most of December 2006.

Nichols also lists individuals that he wanted Walker to call to attack the government's historic case, based on testimony by Clement, Loveless, Arrington, and Banks. He wanted Paula Basham, one of his ex-girlfriends, to testify that Clement was not a rich drug dealer who bought and sold kilos of cocaine, as he testified; that Clement actually had no money, robbed drug dealers, and was broke and homeless when he was in Roanoke; and that when Clement asked Nichols to go into the drug business with him, Nichols refused. Nichols wanted Nicole Baker to tell the jury how Arrington barely knew who Nichols was, but had threatened to kill Nichols for sleeping with Baker. Nichols now says that Basham's testimony would have verified this revenge motive for Arrington to lie about Nichols, since Basham broke up with Nichols when he started sleeping with Baker and licensed a car in her name. He says Baker would have testified that she never saw him with narcotics, and certainly did not see him cooking crack cocaine in her house (as one witness testified). Walker did not call either of these women as witnesses.

Nichols admits that Walker gave reasons for not calling these witnesses, but contends that the reasons were not "strategic." Nichols complains that Walker refused to call witnesses for the purpose of attempting to prove misconduct by the government or to make any such argument. Walker told Nichols that the jury would not believe such testimony, and the court would be

25

annoyed. Nichols also complains that Walker flatly refused to call witnesses who had pending criminal charges themselves, or were incarcerated. Walker told Nichols that he did not believe he could reliably predict what their testimony at trial would be. Walker feared such witnesses would, when placed under oath in the courtroom, make statements harmful to Nichols' defense in exchange for possible sentence reductions.[13] Nichols asked Walker to solve this problem by obtaining statements from each witness, under oath. Walker refused and warned Nichols that this option could backfire and be used to support a sentence enhancement against Nichols for obstruction.

Walker pursued a different strategy. Instead of arguing a government conspiracy to fabricate evidence, Walker suggested from his opening argument that the confidential informant, Rowland, had fooled the police into believing that his marijuana dealings with Nichols were actually cocaine and crack cocaine deals. On cross examination, he prodded Rowland to admit that he told agents that Nichols was his supplier even before the controlled buys.[14] He asked Rowland to explain the use of "green card," suggesting that the term meant marijuana, and asked him how Nichols' dog Lady turned up at a drug deal in December, weeks after she had been euthanized. Among his final questions to Rowland, Walker asked: "[T]he truth of [the] matter is, you ran out of people to get for the police, didn't you? . . . . So you went after Nyron Nichols to try to get your brother out. Isn't that true?" (JA 617-18.)

---

[13] Nichols claims that Walker feared threats of prosecution would convince Nichols' proposed witnesses to testify differently than they told Nichols they would. The court finds no basis, however, on which to credit Nichols' claim that Walker told him prosecutors would bring or threaten to bring unsupported criminal charges against innocent, potential defense witnesses to influence them to testify falsely against Nichols' interests.

[14] Walker asked, Rowland twice, "Okay, did you ever tell them that 'Red' was your supplier?" (JA 605.) Rowland answered, twice, "I told them that 'Red' was doing heavy weight and everybody knew it." (Id.) To refresh Rowland's memory, Walker showed him a report that read: "Detective c. L. Helton, along with Sergeant Charleston met with the confidential informant to set up Nyron Joel Nichols 'Red,' as his/her supplier through a photograph obtained from visual police prints." (Id.) Walker said, "You identified 'Red' as your supplier. . . . Do you deny that you told [police] that this man was your supplier?" (Id. at 605-06.) Rowland answered, "I ain't denying none of that." (Id. at 606.)

Instead of calling the impeachment witnesses Nichols wanted at trial, Walker challenged the credibility of Rowland and the jailhouse witnesses. He questioned each of them closely about the dishonesty inherent in the drug trafficking business and the discrepancies between their trial testimony and their prior statements to authorities. He emphasized their criminal records and the time they hoped to cut from their prison terms by pleading guilty and testifying against Nichols. His cross examination of the incarcerated witnesses suggested that they had embellished the extent of their dealings with Nichols, perhaps in collaboration with other such witnesses, to exaggerate the government's case against Nichols and increase their own sentencing benefits. With the law enforcement witnesses, Walker questioned the quality of the agents' memories and methods, and suggested they had wrongfully placed confidence in convicted felons who gave inconsistent and unreliable testimony. However, he did not ask questions suggesting that the government agents were lying or trying to frame Nichols.

Contrary to Nichols' assertions, the court finds Walker's witness strategies to be reasonable under the circumstances. As the court advised Nichols at sentencing, "[I]f [Mr. Walker] told you that the jury is not likely to believe that Agent Blais is lying, then that's pretty sound. Juries don't believe that." (JA 1258.) Similarly, Walker's concerns about Nichols' other desired witnesses are valid ones. He could reasonably have believed that the inherent credibility, reliability, negative association, and bias problems associated with convicted felons, drug addicts, and family members (and similarly, ex-girlfriends) outweighed any potential benefit their testimony offered the defense. As the record reflects, Walker could not merely rely on expected testimony that any of these witnesses wrote out for Nichols. He also had to make judgment calls about whether each witness would actually offer that testimony in the courtroom or change to a version of the story that damaged the defense. He also had to predict likely cross examination questions of each witness that might be harmful to Nichols' case. Furthermore, Nichols' government fabrication theory required

27

such fanciful extrapolation from minor discrepancies and details that, in light of the evidence as a whole, Walker could reasonably have believed it impractical and distracting to use that theory to attempt to discredit the government's case at trial.[15]

The court must view all of Walker's challenged actions and omissions in light of all the circumstances he faced at the time. As discussed above, counsel's "strategic choices made after thorough investigation of law and facts relevant to the plausible options are virtually unchallengeable." Strickland, 466 U.S. at 688. Similarly, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91. "An attorney can avoid activities that appear distractive from more important duties. . . . [and is] entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." Harrington, 562 U.S. at 107 (internal quotations and citations omitted). The attorney must make judgment calls about what evidence appears to be merely cumulative of other materials, to be of questionable admissibility, or to be focused on issues extrinsic, rather than material to the critical questions in the case. See United States v. Kozinski, 16 F.3d 795, 806 (7th Cir. 1994) ("[O]ne may not contradict for the sake of contradiction; the evidence must have an independent purpose and an independent ground for admission."). Moreover, "[m]erely attempting to prove that a witness is lying is not a proper purpose of impeachment by contradiction." Id. at 807. Thus, "[t]he relevant inquiry under Strickland is not what defense counsel could have pursued [or what the

---

[15] For example, Nichols presents the following evidence that he claims Walker should have investigated further: a new transcript of the recorded telephone call on December 10, 2006, showing that Rowland said to Nichols, "I need a green card that fast," while the transcript the government used at trial represented that Rowland said, "I got a green card that fast." (Deft's Ex. 39, ECF No 311-1); witnesses to testify that the Honda Nichols owned in December 2006 was in the repair shop most of that month and was never painted black, like the vehicle mentioned in the government's recordings of the controlled buys; and the fact that the investigative reports in his case start with Report #4 and the drug test reports start with #002, which Nichols asserts as proof that the government has other reports, numbered with lower numerals, about earlier transactions between Nichols and Rowland that would show their transactions involved only marijuana.

defendant thought counsel should have pursued], but rather whether the choices made by defense counsel were reasonable" under the all the circumstances he faced. Siripongs v. Calderon, 133 F.3d 732, 736 (9th Cir. 1988) (emphasis added).

Walker had stacks of materials to review and investigate, from the government and from Nichols, in addition to Walker's own investigator's reports. With only a limited number of weeks before trial, and later sentencing, Walker had to choose the issues and evidence he believed most promising for the defense and let other topics go as likely to prove extrinsic, cumulative, or more harmful than helpful.

Several of Nichols' claims fall into this category, including the topics that he wanted Basham and Baker to present, as well as Nichols' additional evidence to impeach Clement. Nichols proposed for Walker to call Clement's landlord, Reverend Malone, to say that Clement never paid his rent and was evicted. Such testimony on an extrinsic matter would not have been admitted and would have been cumulative of testimony that Clement was irresponsible with his drug money. Nichols also wanted Walker to obtain middle school attendance records from New York from 1991 to 1994, and to secure testimony from his boyhood friend, Saladin Grant, to show that Nichols was not in Roanoke selling drugs nearly every day before 1997, as Clement testified. The attendance records would likely have been admissible and even persuasive. However, the court cannot find unreasonable Walker's choice to forego the investigative efforts necessary to obtain them before trial. The bulk of the government's evidence involved Nichols' later dealings—from 1997 to 2006. Walker chose to impeach Clement, instead, with Nichols' birth certificate and the absurdity inherent in Clement's testimony that Nichols repeatedly drove a car from New York to Roanoke with large amounts of cocaine at age thirteen. He also elicited Clement's testimony about Nichols never selling drugs at his residence, which was inconsistent with the government's evidence that some of the controlled buys occurred at Nichols' residence.

29

Similarly, Walker had to make choices in rejecting other aspects of Nichols' proposed evidence and trial presentation. Nichols asserts that Walker should have chosen differently—should have questioned the government agents differently, should have pointed out differences between the transaction recordings and the transcripts, should have argued against allowing the jury to take the transcripts into deliberations, and should have ensured that jurors could listen to the actual recordings instead. He claims Walker should have asked Muse why his prior statement to authorities did not mention that Nichols had threatened to send goons after witnesses.[16] Nichols wanted Walker to call inmates Simmons and Boyd at sentencing to testify as witnesses to the "real" conversation between Sales and Nichols, when Sales insisted his half brother, Clement, had told lies about Nichols at trial. In each of these situations, Walker made a tactical decision—to allow the jurors the convenience of reviewing the transcripts of the recorded buys, to forego bringing up Muse's prior statement, which was inculpatory despite Muse's use of the "goons" statement,[17] and to forego eliciting testimony from Simmons or Boyd as unpredictable and unlikely to discredit testimony from Agent Blais and Sales that Nichols wrote the statements Simmons and Boyd witnessed.[18]

The court has reviewed and considered each of Nichols' arguments and exhibits. The court has also reviewed motions and transcripts of hearings from the criminal proceedings, as reflected in

---

[16] Nichols also faults Walker for not moving to strike Muse's obstruction testimony, because it was not disclosed to the defense. Nichols raised this issue on appeal (Appellant's Brief 63-65, ECF No. 288-9) and the Fourth Circuit found no government misconduct regarding evidence disclosure. Nichols, 429 F. App'x at 358. Accordingly, the court cannot find that Walker's failure to move to strike Muse's testimony was deficient performance under Strickland.

[17] In his prior statement, Muse said Nichols had asked him to fabricate testimony that the prosecutor had coerced Muse into testifying falsely about buying drugs from Nichols. At trial, Muse testified that Nichols stayed away from other inmates.

[18] Nichols argued on appeal that Blais had threatened to prosecute Sales if he testified for Nichols, but the Fourth Circuit found no such government misconduct. (Appellant's Brief 35-38, ECF No. 288-8); Nichols, 429 F. App'x at 358.

the long summary of the trial and sentencing hearings. Taking all this evidence into account, the court cannot find that even one of the "errors" that Nichols now alleges in Walker's work as his defense counsel rises to the level of deficient professional performance under <u>Strickland</u>. Rather, the court remains convinced that Walker diligently consulted with Nichols, conducted extensive pretrial and presentencing investigations, and zealously and effectively represented Nichols' legal and evidentiary interests during all stages of the proceedings.[19]

Moreover, Nichols' ineffective assistance claims also fail under the prejudice prong of <u>Strickland</u>. The errors Nichols alleges simply do not undermine the heart of the government's case: his own statement about his large-scale drug operation and use of guns, the corroborating evidence from the cooperating witnesses about their dealings with him between 1997 and 2006, and the testimony from Rowland and the agents about the controlled transactions. The jury could have heard all of the evidence Nichols faults Walker for omitting and still reasonably have found Nichols guilty of the conspiracy, the distribution counts, and the firearm offense. Similarly, the court could still reasonably have found the PSR drug amount and enhancements to be supported by the evidence as a whole. The court simply finds no reasonable likelihood that but for any, or all, of Walker's alleged errors, the outcome at trial or sentencing would have been different.

---

[19] After hearing Nichols' "remarkable" allocution that the case against him was all based on lies and Walker's deficiencies, the court stated to him: "I tell you, from my perspective, to be able to marshal the attack that [Mr. Walker] did on the evidence with so little to work with was truly an outstanding effort and I think that he has done well for you. The fact of the matter is that the evidence in your case was overwhelming." (JA 1258.) The court maintains this belief in Walker's effectiveness now, after review of all the evidence Nichols has presented.

31

## Claim 4: Brady Claims

In his § 2255 motion, Nichols alleges that the government suppressed certain pieces of exculpatory information about its primary drug amount witnesses, in violation of Brady v. Maryland, 373 U.S. 83 (1963) (regarding suppression of material exculpatory evidence) and Napue v. Illinois, 360 U.S. 264 (1995) (regarding knowing use of perjured testimony on material matter). Specifically, he asserts the government should have disclosed to the defense: Loveless' possession of drugs for his own interests while working as a confidential informant and his past crack cocaine addiction, to impeach his testimony that he only used marijuana; any statement or testimony Arrington offered in the federal criminal case against his cousin, Jamar Woody, about drug deals during a period when Woody was committed for psychiatric reasons; and any law enforcement reports or recordings related to controlled transactions Rowland had with Nichols prior to the December 2006 controlled buys.[20]

On direct appeal, Nichols raised a number of claims that the government knew of, but did not correct inaccuracies in their witnesses' testimony, thus allegedly suborning perjury, and that the prosecutor withheld pieces of exculpatory evidence. (Appellant's Brief 29-46; 53-68; ECF Nos. 288-8 & 288-9.) The Fourth Circuit rejected these claims. Nichols, 429 F. App'x at 357-58. The Court ruled that Nichols' claims of perjury constituted attacks on witness credibility rather than any

---

[20] Nichols admits that he has not seen and seeks discovery to confirm the allegedly suppressed evidence about Arrington's false statement or testimony about Jamar Woody and any tapes or reports about Rowland's prior transactions with Nichols. He says that Nichol Baker told him from her personal knowledge about the Woody issue. As to the existence of prior tapes, he merely speculates. Nichols states that he and Rowland had met several times before the controlled buys involved in this case. Rowland allegedly asked Nichols to obtain some marijuana for him to sell, and Nichols agreed. Nichols infers from odd details in this case that law enforcement must have been using Rowland as a CI for at least one of these prior meetings. Nichols points to chain of custody reports and drug test results from the CI transactions in December 2006 that start with Number 2 and suggests that the reports bearing Number 1 must relate to one of the marijuana discussions he had with Rowland and must have been suppressed to allow Nichols to be framed for crack cocaine instead. Nichols further suggests that agents used that prior transaction tape to create a record of a December 27, 2006, cocaine deal that could not have happened, because the December 27 tape mentions the dog "Lady," who was euthanized in November 2006.

incident of government misconduct. Id. The Court also found that the government had not withheld exculpatory evidence as defined in Brady. Id. at 358.

It is well established that a § 2255 motion is not a vehicle for relitigating claims already decided by the appellate court. See United States v. Linder, 552 F.3d 391, 396 (4th Cir. 2009); Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir. 1976) (holding that issues previously decided on direct appeal may not be raised on collateral review). Nichols' Brady claims concerning Loveless' possession of drugs as a CI and allegedly concealed tapes of transactions with Rowland before December 2006 are substantially the same as those he raises in his § 2255 motion. He is merely using slightly different evidence from the record in support of the same legal claim regarding the same allegedly undisclosed evidence. Therefore, the court finds these claims are barred under Linder and Boeckenhaupt from review under § 2255 and must be dismissed without any need for discovery or further discussion.

Nichols did not raise his other § 2255 Brady claims on direct appeal. He indicates, however, that the defense knew or could have known about these issues well before the appeal. Because Nichols clearly could have raised these claims alongside his other Brady issues in his appellate brief, and offers no reason for failing to do so, these claims must be dismissed as procedurally defaulted. See Bousley v. United States, 523 U.S. 614, 622 (1998) ("Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent.") (internal citations and quotation marks omitted). In any event, these claims are without merit.

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. "[S]howing that the prosecution knew

33

of an item of favorable evidence unknown to the defense does not amount to a <u>Brady</u> violation, without more." <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995). The government's constitutional duty to disclose is triggered only when a "reasonable probability" arises that the "cumulative effect of all such evidence suppressed by the government" would result in a different outcome—or in other words, when the "government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"[21] <u>Id.</u> at 434 (quoting <u>United States v. Bagley</u>, 473 U.S. 667, at 678 (1985)).

The court finds no basis from Nichols' submissions or the record to believe that the purported Arrington statement about Woody or the police recording of an earlier transaction between Nichols and Rowland exist. Even if Nichols could prove that they do exist, however, his failure to show the materiality of this information precludes any viable § 2255 claim under <u>Brady</u> or <u>Napue</u>. The court finds no likelihood that this additional evidence would undermine confidence in the jury's verdict or the court's sentencing determinations. <u>See</u> <u>United States v. Agurs</u>, 427 U.S. 97, 109-10 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."). Therefore, the court grants the motion to dismiss as to Nichols' Claim 4, alleging prosecutorial misconduct. An appropriate order will issue this day.

The Clerk is directed to send copies of this memorandum opinion and accompanying order to the defendant and counsel of record for the government.

ENTER: This __5th__ day of March, 2015.

*[signature]*

Chief United States District Judge

---

[21] Like claims under <u>Brady</u>, "[a] <u>Napue</u> claim requires a showing of the falsity and materiality of testimony, as well as a showing that the prosecutor knew of the falsity. <u>Basden v. Lee</u>, 290 F.3d 602, 624 (4th Cir. 2002). "Perjury offered under these circumstances is material if 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" <u>Id.</u> (quoting <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976)).

34